UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
AT COVINGTON

CIVIL ACTION NO. 08-07 (WOB)

LAWANNA KAY THOMAS                                                            PLAINTIFF

VS.                                    **OPINION and ORDER**

BRUNSWICK CORP., ET AL                                                      DEFENDANTS


This matter is before the court on the "Plaintiff's opening brief," which this court will construe as the motion of the plaintiff for judgment on the administrative record (Doc. 23), and the response brief of the defendants, which the court will construe as a cross-motion. (Doc. 26).

The issue in this case is whether Prudential's[1] decision to terminate the plaintiff's long-term disability benefits under the "your regular occupation" standard was arbitrary and capricious. The court finds that Prudential's decision to terminate benefits was arbitrary and capricious and that the plaintiff is entitled to benefits under the "your regular occupation"[2] provision of the Plan.

---

[1] The parties do not discuss the issue of whether Brunswick Corporation is a proper party to this action. Brunswick, however, is not a proper defendant in this action to recover benefits since it did not control the administration of the plan. *See Daniel v. Eaton Corp.*, 839 F.2d 263 (6th Cir. 1988). Therefore, the court will dismiss Brunswick from this action. The Plan is a proper defendant. *See Sullivan v. Cap Gemini Ernst & Young U.S.* 573 F. Supp.2d 1009, 1016-17 (N.D. Ohio 2008). For simplicity, the court shall refer to the Plan and the administrator as "Prudential."

[2] The issue of whether the plaintiff is entitled to benefits under the "any gainful occupation" provision is not before this court.

**FACTS**

In February 1997, the plaintiff, now 50 years old, began working for Hammer Strength.[3] (ADM 182). She worked as a spray painter, operating a paint spray gun to paint exercise equipment on a moving assembly line. (ADM 324). To perform her job, the plaintiff is required to climb four steps to the paint platform, face the painting booth, in which the exercise equipment to be painted slides in from the assembly line, and using a trigger sprayer, paints the equipment. (ADM 205). She does not have a bar to hold onto as she paints. It is undisputed that the plaintiff's occupation requires a medium level of exertion.

As part of her employment benefits, the plaintiff was a participant in a long-term disability ("LTD") benefits plan Prudential issued to Brunswick Corporation and its various companies ("the Plan"). (ADM 395).

The Plan states, in relevant part:

**How Does Prudential Define Disability?**

You are disabled when Prudential determines that:

- You are unable to perform the **material and substantial duties** of your **regular occupation** due to your **sickness or injury**, . . .

. . .

**Material and substantial duties** mean duties that*:*

- are normally required for the performance of your regular occupation*;* and
- cannot be reasonably omitted or modified, . . ..

**Regular occupation** means the occupation you are routinely performing when your disability begins. Prudential will look at your occupation as it is normally performed instead of how the work tasks are performed for a specific employer or at a specific location.

---

[3]Hammer Strength is an operating division of Life Fitness, which is an operating subsidiary of Brunswick.

(ADM 235).

### A. Plaintiff's medical record

On January 22, 2006, the plaintiff woke up with a headache, took some medicine and passed out, hitting her head. (ADM 164). On January 23, 2006, she went to Healthpoint Family Care Center and missed her first day of work due to the incident. Dr. Guttman, plaintiff's treating physician, diagnosed her with headaches and syncope. On January 27, 2006, Dr. Guttman completed an "attending physician's statement," stating that the plaintiff has headaches that are severe, come on suddenly with associated dizziness. She also has a sudden onset of syncope and has hurt herself several times falling. (ADM 188-89). Dr. Guttman restricted the plaintiff from driving and working with heavy machinery. (ADM 188-89). Dr. Guttman also stated that she believed the prognosis was good for the plaintiff to return to work. Dr. Guttman referred the plaintiff to Dr. Becker, a neurologist, for further testing.

On February 17, 2006, Dr. Becker ordered a MRA, which found that plaintiff has "a complete occlusion of the right internal carotid artery," and "stenoses [sic] suggested origins of both vertebral arteries, worse on left than right." (ADM 171-72).

On February 27, 2006, Dr. Guttman provided plaintiff with a statement that she is unable to work from February 2, 2006 to March 15, 2006 due to her medical condition and ongoing work up. (ADM 180).

On March 14, 2006, the plaintiff was experiencing pain in her chest, weakness in her legs, and pain in her back. (ADM 157). Dr. Guttman diagnosed her with a possible compression fracture, myalgia and weakness in her legs. (Id.). On March 16, 2006, MRIs confirmed a "moderate relatively acute or subacute compression fracture of the T8 vertebral body." (ADM

151).  A March 24, 2006 MRI evidenced a small disc protrusion at C5-6 on the left.  (ADM 143).

On May 9, 2006, Dr. Skidmore examined the plaintiff, who was complaining of back, leg, neck and arm pain.  (ADM 140).  Dr. Skidmore reviewed the physical findings and x-rays and concluded that cervical spine surgery would not be beneficial.  He suggested that she try chiropractic care since no relief was provided by physical therapy.  Dr. Skidmore also found that she likely has evidence of ulnar neuropathy in the left arm with a positive Tinel's sign to palpitation of the left ulnar nerve at the elbow.  He instructed her to try to keep her left arm straight to avoid pressure points to left elbow.

In May 2006, the plaintiff also began treatment with Dr. Bardgett, a vascular surgeon.  Dr. Bardgett confirmed occlusive arterial disease, but was reluctant to recommend surgical intervention, instead ordering that she be followed with carotid ultrasounds.  (ADM 55-56).

On June 19, 2006, the Social Security Administration denied benefits to the plaintiff, finding that, although she could not perform her past relevant work, substantial work was available for which the plaintiff is qualified.  (ADM 123-24).

On July 6, 2006, the plaintiff reported to Dr. Guttman that she had a syncopal episode a few days earlier.  Dr. Guttman referred the plaintiff to Dr. O'Connell, a neurologist.

On July 21, 2006, Dr. O'Connell examined the plaintiff.  (ADM 65).  He noted that she has had four brief syncopal episodes in the last ten months.  A July 24, 2006 MRI of plaintiff's brain was normal with occlusion of the right internal carotid artery.  (ADM 63).   On August 6, 2006, the plaintiff returned for follow up and reported that she is rarely having headaches.  (ADM 64).  Dr. O'Connell suggested she see a cardiologist for her complaints of chest pain, diaphoresis, and arm pain.

On August 10, 2006, Dr. Srinivasan, a cardiologist, examined the plaintiff, who was complaining of chest pains that traveled into her left arm and back. (ADM 37). Dr. Srinivasan opined that the plaintiff was suffering from other and unspecified angina pectoris, syncope and collapse, and occlusion and stenosis of carotid artery with cerebral infarction. (ADM 39). The August 15, 2006 cardiac catheterization found normal coronary arteries. (ADM 93-94). Dr. Srinivasan stated that he thought consideration should be given to finding a non-cardiac etiology as the cause of plaintiff's symptoms. (ADM 94). During her October 9, 2006 follow up appointment, the plaintiff told the doctor she did not have chest pain, angina, syncope or numbness. (ADM 29-30).

On November 27, 2006, the plaintiff returned to Dr. O'Connell's office complaining of another episode of dizziness and left facial numbness. (ADM 65). Dr. O'Connell ordered an EEG, which was considered abnormal because of focal slow wave activity in the left anterior temporal electrodes consistent with focal cerebral dysfunction in the left anterior temporal region. On January 8, 2007, Dr. O'Connell noted that the plaintiff had not had any more spells. His impressions were that the plaintiff has spells of unclear etiology with a mildly abnormal EEG.

The physicians have not been able to identify a clear etiology for claimant's symptoms. (ADM 320).

**B.  Determination of benefits**.

On February 3, 2006, plaintiff applied for disability benefits. (ADM 181). On the employer statement, the human resources manager listed the plaintiff's occupation as "powder coater" and checked it required light exertion. (ADM 183). The employee statement listed plaintiff's occupation as "painter" and checked that it required heavy exertion. (ADM 184).

Prudential did not seek clarification of plaintiff's occupation or required level of exertion.

On February 15, 2006, Prudential granted the plaintiff short term disability ("STD") benefits through February 6, 2006, and told her to submit additional documentation if she wanted benefits extended. (ADM 178-79). Prudential extended plaintiff's STD benefits several times. (ADM 194-95, 290, 297, 301-04). Commencing July 24, 2006, the STD benefits were converted to long term disability ("LTD") benefits.

On November 27, 2006, Prudential's in-house nurse, Susan Palermo, R.N., performed a clinical review on plaintiff's file. (ADM 311-13). After a review of the medical evidence, Nurse Palermo concluded that the plaintiff could do light work on a regular and sustained basis, but should not exceed light work and should avoid climbing ladders, unprotected heights, working on stairs, operating/moving heavy equipment and driving. (ADM 313). She also concluded that there were no functional impairments from plaintiff's claims of reflux, chest pain/tightness or angina. She also found plaintiff's complaints of having trouble walking due to muscle cramps, back pain and lack of strength were not substantiated by the record, which demonstrated that the plaintiff had a normal gait, motor and sensory exams. (ADM 313.)

On November 28, 2006, Prudential's vocational rehabilitation specialists reviewed the plaintiff's vocational information to determine how her regular occupation would normally be performed. (ADM 314). The specialist found that the plaintiff's regular occupation would essentially relate to the DOT's Painter, Spray I, which is a medium level job. (*Id.*).

On December 19, 2006, Prudential sent plaintiff a letter notifying her that her LTD benefits were terminated effective January 1, 2007 because the medical evidence establishes that she "is capable of light work on a sustained basis," including her regular occupation as powder

6

coater.  (ADM 276-78).

On March 6, 2006, the plaintiff appealed Prudential's decision to terminate her benefits.  (ADM 77).  In her appeal letter, the plaintiff pointed out to Prudential that her regular occupation was classified incorrectly as light work and that the administrator had failed to consider the cumulative effect of all her conditions.  (ADM 77).

On April 5, 2007, Prudential referred plaintiff's claim to Dr. Day, its in-house physician.  Dr. Day concluded that the medical evidence established the claimant's work restrictions would be based on her "passing out" in a work environment that would be a hazardous environment to have an episode.  (ADM 318-20).  On April 9, 2007, Prudential affirmed its termination of benefits, finding that the claimant was not currently experiencing any level of functional loss from syncopal events: having had her last episode in October 2006.  (ADM 271-73).

On July 27, 2007, the plaintiff filed a second appeal, arguing that her regular occupation was a medium level job and that it was performed in a hazardous environment: on a platform and next to a moving assembly line.  She also argued that Prudential did not consider the effect of all her symptoms on her ability to work: pain, carotid artery disease, dizziness, migraine, severe headaches, back and leg problems, compression fracture of the spine, vascular disease, fatigue and history of Hodgkin's disease.  (ADM 3-4).

On August 20, 2007, Prudential referred plaintiff's file and appeals to another in-house vocational rehabilitation specialist.  (ADM 324).  This specialist pointed out that the November 2006 analysis performed by his co-worker correctly classified plaintiff's position as a medium level occupation and stated that the plaintiff was not harmed by Prudential's labeling of her occupation as "powder coater" instead of "painter, spray."  (ADM 324).  He also opined that

operating a spray machine is not dangerous, instead, it is the act of passing out that is dangerous. (ADM 325).

On October 2, 2007, Prudential once again upheld its decision to terminate plaintiff's LTD benefits, admitting that the plaintiff's job is a medium level occupation and finding that it is not performed in a hazardous setting. (ADM 266-68). The plaintiff filed this appeal seeking a reversal of Prudential's decision.

## ANALYSIS

### A. ERISA

It is uncontested that this case is governed by ERISA. The parties also agree that the court must determine whether Prudential's decision to deny extended benefits was arbitrary and capricious. "The arbitrary and capricious standard is the least demanding form of judicial review of administrative action. When applying the arbitrary and capricious standard, the courts must decide whether the plan administrator's decision was rational in light of the plan's provisions. Stated differently, when it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary and capricious." *Smith v. Continental Cas. Co.*, 450 F.3d 253, 259 (6th Cir. 2006) (*quoting Williams v. International Paper Co.*, 227 F.3d 706, 712 (6th Cir. 2000)). Although the arbitrary and capricious standard is highly deferential, it does not amount to "no review." *Id*.

The plaintiff argues that the court should consider the conflict of interest created by Prudential's dual role as the Plan administrator and as the payor of the benefits in determining whether its decision was proper.

The Supreme Court recently addressed how Prudential's dual role is to be considered by a

8

court in its determination of whether the administrator abused its discretion in a benefit decision. *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. ___, 128 S. Ct. 2343 (June 19, 2008). The Supreme Court stated:

> Often the entity that administers the plan, such as an employer or an insurance company, both determines whether an employee is eligible for benefits and pays benefits out of its own pocket. We here decide that this dual role creates a conflict of interest; that a reviewing court should consider that conflict as a factor in determining whether the plan administrator has abused its discretion in denying benefits; and that the significance of the factor will depend upon the circumstances of the particular case.

*Id.* (*citing Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).

Thus, *Glenn* makes it clear that the conflict of interest is just one of many factors that this court must consider in determining whether the defendant abused its discretion. "[A]ny one factor will act as a tiebreaker when the other factors are closely balanced, the degree of closeness necessary depending upon the tiebreaking factor's inherent or case-specific importance." *Glenn*, 554 U.S. ___, 128 S. Ct. at 2352.

Here, the parties have stipulated that Prudential both administers the Plan and pays benefits. (Doc. 26, p. 18). Accordingly, pursuant to *Glenn*, a conflict of interest does exist. *Id.* Therefore, the court should consider the conflict of interest as a factor in its review to determine whether Prudential abused its discretion in terminating the plaintiff's benefits. This factor, however, does not change the abuse of discretion standard for reviewing the administrator's decision. Id.

**B. Prudential's decision was Arbitrary and Capricious.**

Prudential terminated plaintiff's benefits effective January 1, 2007. (ADM 276-78). In explaining the reason behind the termination, Prudential stated:

> You went out of work on January 23, 2006 due to syncopal episodes caused by right

internal carotid artery occlusion and stenosis. You report that your last syncopal episode was in July 2006. Office visit notes form Dr. O'Connell, neurologist, dated August 2, 2006, indicate your brain MRI was essentially normal and your physical examination was within normal limits. He recommended you follow up with a cardiologist regarding your chest pain and carotid artery disease.

Office visit notes from Dr. Srinivasan, cardiologist, from October 9, 2006 indicate you have hypertension, carotid artery stenosis, and hyperlipidemia. Your physical examination is unremarkable and you have no complaints in regard to the above conditions. Your cardiac catheterization of August 15, 2006 showed normal coronary arteries, and your October 6, 2006 echocardiogram was normal, measuring an ejection fraction of 65%. He recommended you take Lipitor and return in three months.

Office visit notes from neurologist Dr. Bardgett dated October 17, 2006 indicate your temporal artery pulses are palpable, there are no carotid bruits, no heart murmur, your dorsalis pedis posterior tibial pulses are palpable and normal bilaterally, and you had no peripheral edema. A review of your carotid duplex study showed the left side as normal, and confirmed the right side occlusion. He recommends you follow up with another carotid ultrasound in March 2007.

In a telephone call with this office on October 26, 2006, you indicated problems walking due to muscle cramps; back pain, difficulty swallowing and lack of strength. However, your physical examinations all appear unremarkable with a normal gait, motor and sensory exam. In addition, since your cardiologist and neurologist are recommending routine followup of your carotid stenosis in three to five months it appears your condition remains stable at this time.

A review of the above records reveals **you would be capable of light work on a sustained basis.** Due to your right internal carotid occlusion and your prior syncopal episodes it would be reasonable that you should avoid climbing ladders, working at unprotected heights, working on stairs, and operating heavy equipment.

Since your policy contains the regular occupation provision, your position as Powder Coater was evaluated and, based on the Department of Labor's Dictionary of Occupational Titles, the material and substantial duties of your regular occupation as Powder Coater is defined as spraying surfaces of machines, manufactured products, or a working area with protective or decorative material using a spray gun. In performing this occupation's material and substantial duties a person would generally be required to exert force to lift, carry, push/pull objects weighing 10 to 25 pounds frequently or up to 10 pounds constantly. You may have need to stoop, crouch, walk and/or stand throughout the work day, and there would be frequent use of upper extremities for reaching and fingering items. Climbing is not characteristic of this occupation as typically performed.

Therefore, the restrictions based on the medical documentation on file would not prevent

>you from performing the material and substantial duties of your regular occupation. Therefore, you would no longer meet the definition of disability, and your claim for LTD will terminate effective January 1, 2007.

(ADM-277)(emphasis added).

This analysis incorrectly identified the material and substantial duties of the plaintiff's occupation as being in the light category.[4] On November 28, 2006, Prudential's in-house vocational rehabilitation specialist classified plaintiff's job as medium, requiring her to exert force, lift/carry, push/pull objects between 20 to 50 pounds occasionally, 10 to 25 pounds frequently, or up to 10 pounds constantly. (ADM 314). Prudential eventually admitted that the plaintiff's regular occupation requires a medium level of exertion. (ADM 211, 267, 324).

Prudential never obtained a clinical assessment that the plaintiff was capable of medium work. The only evidence in the record is the November 27, 2006 clinical assessment by plaintiff's in-house nurse stating the plaintiff should not exceed light work. (ADM 313). Prudential argues that the use of the incorrect term "powder coater" instead of "painter, spray" did not harm the plaintiff. There is no evidence to support this statement.

Instead, the evidence demonstrates that Prudential carried the incorrect classification of plaintiff's position as light throughout its analysis. (ADM 315-316). This is evidenced by the March 27, 2007 claims manager note, stating: "occupation: powder coater, classified as Light .... Claim was terminated as of 1/1/07 as [regular occupation] review determined that own

---

[4]Prudential argues that the Plan provides that it evaluate the plaintiff's occupation as it is normally performed as opposed to how it is performed with a particular employer. This argument is persuasive only as it relates to the fact the plaintiff does not need to climb to perform the occupation of painter as it is normally performed. It does not change the exertional requirements for the position from medium to light. Prudential has admitted plaintiff's job requires medium exertion ( ADM 267).

[occupation] is light, and medical review determined that [claimant] can perform own [occupation]." The record supports a finding that Prudential terminated plaintiff's benefits because it found she could perform her regular light level occupation. Her occupation, however, was a medium level occupation. Thus, Prudential's decision to terminate benefits was not based on the evidence and was arbitrary and capricious. *See Gilchrest v. Unum Life Ins. Co. of America*, 255 Fed. Appx 38 (6th Cir. 2007) (Unum arbitrary and capricious in terminating benefits under regular occupation where evidence established that the material and substantial duties of plaintiff's regular occupation required he perform more duties than were defined by job description).

In addition, the court finds that Prudential failed to consider the total effect that the combination of all of plaintiff's impairments had on her ability to function at the medium level. The record demonstrates the plaintiff suffers from a compression fracture of the T8 vertebrae, a herniated cervical disc at C5-6, which has not been helped by physical therapy, occlusive artery disease, pain and weakness in her legs and left arm, chest pains, headaches, neck and back pain. (ADM 135-151).

Based on the evidence presented, the court finds that the record demonstrates that the plaintiff cannot perform "the material and substantial duties of [her] regular [medium level] occupation." As discussed above, Prudential's own nurse opined that the plaintiff "should not exceed [l]ight [w]ork." Accordingly, defendant's decision to terminate benefits under the "your regular occupation" was arbitrary and capricious and the plaintiff is entitled to benefits.

**C. Attorney Fees**.

Plaintiff seeks attorney fees under 29 U.S.C. § 1132(g)(1). The Sixth Circuit recently

reviewed its test for determining whether to award attorney fees in an ERISA case, stating:

> In an action by [an ERISA] plan participant, the district court, in its discretion, "may allow a reasonable attorney's fee and costs of action to either party.'" *Moon,* 461 F.3d at 642 (quoting §1132(g)(1)). "[O]ur circuit recognizes no presumption as to whether attorney fees will be awarded." *Foltice v. Guardsman Prods., Inc.,* 98 F.3d 933, 936 (6th Cir. 1996).
>
> We apply the following five-factor test, first set forth in *Secretary of the Department of Labor v. King,* 775 F.2d 666 (6th Cir. 1985), to determine whether a district court properly exercised its discretion in awarding fees under § 1132(g)(1):
>
>> (1) the degree of the opposing party's culpability or bad faith; (2) the opposing party's ability to satisfy an award of attorney's fees; (3) the deterrent effect of an award on other persons under similar circumstances; (4) whether the party requesting fees sought to confer a common benefit on all participants and beneficiaries of an ERISA plan or resolve significant legal questions regarding ERISA; and (5) the relative merits of the parties' positions.
>
> *Moon,* 461 F.3d at 642 (citing *King,* 775 F.2d at 669). "No single factor is determinative, and thus, the district court must consider each factor before exercising its discretion." *Id.* at 642-43.

*Gaeth v. Hartford Life Ins. Co.*, 538 F.3d 524, 529 (6th Cir. 2008).

The first factor, culpability or bad faith, weighs in favor of a fee. Although Prudential may not have initially denied benefits in bad faith, once the plaintiff's attorney told Prudential that it had incorrectly classified plaintiff's position as light, Prudential should have obtained an updated evaluation. Instead, Prudential insisted that the plaintiff was not harmed by the use of the term "powder coater" instead of "painter, spray." However, the record establishes that a powder coater position is classified as a light occupation and a painter, spray position is classified as a medium occupation. Thus, the distinction was relevant to the plaintiff's claim.

Further, once Prudential learned that plaintiff's position was indeed a medium level job, it did not obtain a further clinical evaluation. Prudential's in-house nurse had opined that the plaintiff was limited to light work. (ADM 313). Thus, relying on the same evaluation used in

terminating benefits, the plaintiff, being limited to light work, would not have been able to perform her medium level job, thereby meeting the "your regular occupation" standard. There being no evidence in the record that she could perform at the medium level, Prudential's refusal to reconsider her claim could be classified as being in bad faith. *See Gaeth*, 538 F.2d at 530-31 (termination of benefits found to be bad faith where no evidence regarding his physical condition as relates to his occupation).

The second factor, Prudential's ability to satisfy the award of fees clearly falls in favor of awarding attorney fees.

The third factor, the deterrent effect of a fee award, requires consideration of whether a fee award would have a deterrent effect on other plan administrators and also weighs in favor of a fee award. *Id*. at 531.  In *Gaeth*, the Sixth Circuit found its decision in *Moon*, 461 F.3d 639 instructive, stating:

> In *Moon,* the court concluded that the facts of that case - in which the plan administrator denied benefits based solely on the opinion of its own employed physician, who ignored record evidence of the claimant's disability and did not examine the claimant - "are not so unique that they fail to serve any deterrence value to other insurance companies under similar circumstances," and that the court's opinion in an earlier appeal of the same case "articulated important principles that all plan administrators should heed. For example, before terminating a plan participant's benefits, a plan administrator should ensure that the opinions upon which they rely to make their decisions to terminate are based on a thorough review of the administrative record." *Id.* at 645.  The key question in analyzing this third factor is therefore whether the fee award would have a deterrent effect on other plan administrators.

Id. at 531-32.

Here, the fact Prudential ignored a finding by its own vocational specialist that plaintiff's job required a medium level of exertion and terminated benefits, based upon its in-house nurse's assessment that she could perform light work, is evidence that Prudential did not ensure that its

14

decision was based upon a thorough review of the record. In addition, once it conceded that plaintiff's job was a medium level position, it did not obtain an updated assessment on whether the plaintiff could perform her medium level occupation. Thus, a fee award would have a deterrent effect on other plan administrators to ensure that it terminates benefits only after a thorough review of the record and after a proper determination as to what is the plaintiff's regular occupation.

The fourth factor, conferring a common benefit on plan participants or resolving a significant legal question under ERISA, weighs against a fee award. Here, the plaintiff does not argue that she is seeking to confer a common benefit for all participants under the plan. In addition, this litigation does not resolve any difficult ERISA questions. *See Gaeth*, 538 F.3d at 533-34.

Lastly, the fifth factor, relative merits of the parties' positions, also weighs in favor of an award. Here, the only clinical assessment of record provides that the plaintiff is limited to light work. Yet, after its vocational specialist found her job was a medium level position, Prudential terminated benefits, under the "your regular occupation" provision, finding she could perform at the light level.

The court finds that four of the five factors for an award of attorney fees weigh in plaintiff's favor. Thus, the court finds an award of attorney fees is appropriate in this matter.

Therefore, the court having been sufficiently advised,

**IT IS ORDERED** as follows:

1. That defendant Brunswick Corporation is dismissed from this action as being an improper party defendant;

2. That plaintiff's motion for judgment on the administrative record (Doc. #23) be, and it is, hereby **granted;**

3. That the cross-motion of Prudential (Doc. #26) be, and it is, hereby denied;.and

4. That plaintiff shall file an itemized statement of fees requested within **ten (10) days** of the date of this Order. Prudential shall file any objections thereto within **ten (10) days** thereafter. If Prudential has no objections to the plaintiff's itemization, the parties shall submit a joint final judgment to the court within **fifteen (15) days** of the date of the filing of the itemization.

This 30th day of January, 2009.

Signed By:
*William O. Bertelsman* WOB
United States District Judge